O



I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY FIRST CLASS MAIL POSTAGE PREPAID, TO ~~ALL COUNSEL~~ Petitioner ~~(OR PARTIES)~~ AT THEIR RESPECTIVE MOST RECENT ADDRESS OF RECORD IN THIS ACTION ON THIS DATE.

DATED: 5.29.12

DEPUTY CLERK



FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 29 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                            DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE RODRIGUEZ, | ) Case No. CV 12-0765-JPR |
| Petitioner, | ) MEMORANDUM OPINION AND ORDER |
| vs. | ) DENYING PETITION AND DISMISSING |
| T. OCHOA, Warden, | ) ACTION WITH PREJUDICE |
| Respondent. | ) |

## PROCEEDINGS

On January 27, 2012, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. On March 21, 2012, after one extension of time, Respondent filed an Answer with an attached Memorandum of Points and Authorities. Petitioner did not file a reply. For the reasons discussed below, the Court denies the Petition and dismisses this action with prejudice.

## BACKGROUND

On April 9, 2010, Petitioner was convicted by a jury of two counts of assault with a deadly weapon (Cal. Penal Code § 245(a)(1)). (Lodged Doc. 8, Clerk's Tr. at 21-23, 117-18,

121.)  For each count, the jury found true that Petitioner personally inflicted great bodily injury (Cal. Penal Code § 12022.7) and used a knife (id. § 12022(b)(1)).  (Lodged Doc. 8, Clerk's Tr. at 117-18.)  The jury acquitted Petitioner of attempted murder.  (Id. at 121.)

On July 15, 2010, the trial court struck the great-bodily-injury enhancements and sentenced Petitioner to three years in state prison.  (Id. at 161-65.)  He appealed, raising three arguments that correspond to the three grounds for relief alleged in the Petition.  (Lodged Doc. 1.)  On August 24, 2011, the California Court of Appeal affirmed the judgment but modified Petitioner's sentence to strike the deadly-weapon enhancement and stay a concurrent sentence.  (Lodged Doc. 4.)  On September 26, 2011, Petitioner filed a Petition for Review in the California Supreme Court, which summarily denied it on November 2, 2011.  (Lodged Docs. 5, 6.)  Petitioner did not file any state habeas petitions.  (See Pet. at 5.)

## PETITIONER'S CLAIMS

1. The trial court allowed the prosecution to present evidence and argument regarding Petitioner's silence in response to a police officer's questions, violating Petitioner's due process rights, Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).  (Pet. at 6.)

2. The trial court excluded relevant testimony from a defense witness, violating Petitioner's right to due process and to present a defense.  (Pet. at 7.)

2

3.  The trial court erred in instructing the jury on Petitioner's flight from the scene of the crime. (Pet. at 8.)

**SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

The factual summary set forth in a state appellate court opinion is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See <u>Vasquez v. Kirkland</u>, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009). Because Petitioner does not challenge the sufficiency of the evidence, the Court adopts the following factual summary from the California Court of Appeal opinion as a fair and accurate summary of the evidence presented at trial.

**I. The Prosecution Case**

In approximately July or August of 2009, Jose Santos Escobar [FN3] rented a bedroom in an apartment in Compton that Sandra Munoz shared with [Petitioner] and her three children. At the time, Escobar had a romantic relationship with Munoz and it continued after he moved in. In the early part of November, Munoz asked Escobar to move to the attached garage. According to Escobar, she requested that he move because [Petitioner] was jealous of him.

[FN3.] Escobar acknowledged he had suffered two prior convictions for possession of drugs with the intent to sell. He also admitted obtaining fake identification cards and using different names.

On the night of November 4, 2009, Escobar returned home from work. He went into the apartment to take a

3

shower. [Petitioner] and Munoz's children were inside. As Escobar walked toward [Petitioner], [Petitioner] stared at him and asked, "What's going on between you and my woman?" Escobar replied that if [Petitioner] wanted to know, he had to ask Munoz. As Escobar walked by, [Petitioner] touched him in the back and when Escobar turned, [Petitioner] stabbed him in the sternum with a pocket knife. Escobar had no weapons and was carrying nothing in his hands. [Petitioner] continued to stab Escobar in the chest, arms, and legs and said a number of times that he was going to kill him. During the attack, [Petitioner] also slashed Escobar's face. As the assault ensued, Escobar did not strike [Petitioner] or threaten him.

Near the end of the incident, Escobar grabbed the knife and sustained cuts to his hand. During the struggle over the knife, Escobar slipped and fell to the floor. [Petitioner] stabbed him a final time in the leg, ran out the front door, got into his car, and left. Escobar, bleeding profusely, told one of Munoz's children to call the police.

Escobar said he was stabbed or cut 25 times. He had a number of scars as a result of the attack, which he exhibited to the jury. He was in the hospital for five days and was still suffering lingering effects from the stabbing at the time of trial.

At the time of the incident, Escobar weighed 125 pounds. [Petitioner] weighed more than 200 pounds.

4

. . . .

On the evening of November 4, 2009, Los Angeles County Deputy Sheriff Marco Miranda came in contact with [Petitioner], who was seated in the backseat of a patrol car. Deputy Miranda understood that [Petitioner] had driven to the station and had spoken with another deputy. Deputy Miranda observed that [Petitioner] had no bruising, swelling, or cuts to his face, arms, or upper body. [Petitioner] had dried blood on his cheek and dried and wet blood on his clothes and hands. Deputy Miranda did not see any injuries to [Petitioner]'s hands.

After being advised of and waiving his [Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] rights, [Petitioner] told the deputy that he stabbed Escobar in self-defense. When Deputy Miranda attempted to ask further questions, [Petitioner] became uncooperative and said that was all he was going to say. The interview ended. When conducting a later search of the car [Petitioner] had driven to the station, Deputy Miranda located a folding knife with bloodstains on the blade.

. . . .

Deputy Miranda also spoke to Escobar. Escobar said that he and [Petitioner] were arguing when [Petitioner] took out a knife and stabbed him in the arm. [Petitioner] then stabbed him in the chest. Escobar did not describe any other injuries. Deputy Miranda observed both wounds. Although Deputy Miranda noticed only those

large wounds, he could not say whether Escobar had suffered any other injuries due to the amount of blood on Escobar's body.

## II. The Defense Case

Twelve-year-old Maite Marquina lived in the apartment with her mother, Sandra Munoz, [Petitioner], Escobar, and two brothers. She saw Escobar threaten [Petitioner] two or three times. During one such threat, she observed Escobar with a knife. He was holding it up to protect Munoz because [Petitioner] was yelling at her. She also heard Escobar say he wished that [Petitioner] would be struck by a car or attacked by dogs. Maite acknowledged that she loved [Petitioner] and did not want him to get in any trouble.

Leonel Guizar is [Petitioner]'s neighbor. They had lived in the same apartment building for seven years. He believed [Petitioner] to be a good man who never bothered another neighbor. In February 2010, three months after the November incident, Escobar and Munoz threatened to beat Guizar because Guizar told Escobar to move a truck out of the driveway. Guizar called the police. He admitted that he told police that Munoz had threatened to kill him and that the person who was with Munoz was bald. Guizar conceded that Escobar is not bald. Nonetheless, he was certain it was Escobar who threatened him.

Maria Ruelas has been [Petitioner]'s next door neighbor for seven years and considers him a friend. She opined that [Petitioner] is a peaceful man. She believed

6

Escobar to be an aggressive person. Two days before the November incident, Ruelas was sweeping her patio. For no reason, Escobar opened the door and called her a stupid old lady. Afterwards, [Petitioner] and Munoz stepped outside. Escobar cursed [Petitioner] and said he was going to kill him or get a Long Beach gang to do it for him.

Sotelo Garcia is acquainted with Escobar and [Petitioner]. He had a conversation with Escobar after what Garcia called the "accident," referring to the stabbing. He later changed his statement and said they spoke before the accident. Still later, he acknowledged it was possible the encounter was after the accident. Garcia approached Escobar because he appeared angry and Garcia wanted to ascertain why. Escobar said he was very bothered by the fact that [Petitioner] continued to live in the home with Munoz. Garcia responded that it was appropriate that Escobar was the one who left. (Escobar did not return to the apartment after the stabbing.) Escobar said that he wanted to kill [Petitioner]. When Garcia asked why, Escobar did not answer.

Sandra Munoz has had a relationship with [Petitioner] for seven years. She believes he is a peaceful person. In approximately April 2009, she entered into a romantic relationship with Escobar even though she continued to live with [Petitioner]. According to Munoz, [Petitioner] was unaware of her romance with Escobar. [Petitioner] respected Escobar as

7

a renter; Escobar was aggressive with [Petitioner], saying often that he did not like him. On occasion, while Munoz was arguing with [Petitioner], Escobar would insert himself into the discussion, pull his knife, and curse. Three months after Escobar began renting a bedroom in the apartment, Munoz asked him to move into the garage because he was violent, rude, and aggressive.

On November 9, five days after the stabbing, Munoz contacted the police and informed them that Escobar was threatening her. Later, Munoz corrected herself and said the threat occurred before the November 4 stabbing. She said Escobar told her that he would tell [Petitioner], her children, and the neighbors she had AIDS if she did not stop seeing [Petitioner]. Munoz acknowledged that she had the AIDS virus, but she had not told anyone other than her sister about her condition. Escobar knew she had the AIDS virus because he and Munoz met at an AIDS clinic.

About two weeks before the trial, Munoz went to a Laundromat with Escobar. While there, Escobar told her not to come to court or she would regret it. She did not report the threat to police. She opined that Escobar was an aggressive and violent person.

[Petitioner] said that on November 4, 2009, he was living with Munoz and her three children. Escobar stayed in the garage. That evening, Munoz called and asked him to pick her up at the Laundromat. As [Petitioner] was gathering his things, Escobar came into the kitchen.

[Petitioner] asked Escobar why he was inside, as ordinarily Escobar did not come into the apartment during night time hours. Escobar cursed and threatened to kill him. At that point, Escobar "launched himself against [Petitioner]." [Petitioner] noticed Escobar had something shiny in his hand. Escobar struck him with his forearm, breaking [Petitioner]'s glasses. [Petitioner] grabbed Escobar and they struggled. Escobar reached for something near his pocket and tried to open it, but [Petitioner] prevented him from doing so. Escobar began putting pressure under [Petitioner]'s chin and choking him. [Petitioner] took out his knife and cut Escobar on the arm to get Escobar off of him. [Petitioner] was afraid because every day during the prior month Escobar had threatened to kill him. [Petitioner] shouted at Javier to call the police.

The men continued to struggle. [Petitioner] cut Escobar several times; however, he did not know how many wounds he inflicted. [Petitioner] had no idea how Escobar came to have so many wounds, as he did not intentionally stab him. [Petitioner] could not explain Escobar's chest wound, saying he did not stab him there. At some point, Escobar fell to the ground. [Petitioner] denied stabbing him further. He ran across the street to the police station. Later, he said he drove his car to the station.

During the struggle, [Petitioner] thought Escobar was going to kill him and the children. [Petitioner]

9

> acknowledged that he was not stabbed or cut during the incident.
>
> When [Petitioner] drove to the police station, he was in the midst of having a heart attack. He was gasping for air. He told an officer that he had stabbed Escobar in self-defense. After he told the officers he was having a heart attack, they took pictures of him and placed him into the backseat of a patrol car. [Petitioner] said that no one at the station advised him that he had a right to remain silent.

(Lodged Doc. 4 at 2-8 (footnote omitted).)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under AEDPA, the "clearly established Federal law" that controls federal habeas review of state-court decisions consists of holdings of Supreme Court cases "as of the time of the

relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Id. at 391, 413. A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts' (emphasis added)." Id. at 11. A state-court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. Williams, 529 U.S. at 406-08. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Id. at 409-10. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and

11

comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. ___, 131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011).

Here, Petitioner raised all three grounds for relief on direct appeal. (Lodged Doc. 1.) The court of appeal denied claims two and three on the merits and as to claim one — Petitioner's Doyle-error claim — found that any error was harmless. (Lodged Doc. 4 at 8-9.) Petitioner asserted the same arguments in his Petition for Review; the California Supreme Court summarily denied it. (Lodged Docs. 5, 6.) Thus, the Court "looks through" the state supreme court's silent denial to the last reasoned decision as the basis for the state court's judgment. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 2595, 115 L. Ed. 2d 706 (1991) (holding that California Supreme Court, by its silent denial of petition for review, presumably did not intend to change court of appeal's analysis); see also Berghuis v. Thompkins, 560 U.S. ___, 130 S. Ct. 2250, 2259, 176 L. Ed. 2d 1098 (2010) (when state supreme court denies discretionary review of decision on direct appeal, that decision is relevant state-court decision for purposes of AEDPA's standard of review). Because the court of appeal adjudicated Petitioner's claims on the merits, the Court reviews them under the deferential AEDPA standard of review. See Richter, 131 S. Ct. at 784.

## DISCUSSION

### I. Any *Doyle* error was harmless

Petitioner argues in ground one that his due process rights were violated when the trial court allowed the prosecutor to

comment on his silence in response to some of Officer Miranda's questions about the stabbing. Although Petitioner apparently voluntarily gave a statement to police asserting that he had stabbed Escobar in self-defense, he subsequently refused to answer any of the police's questions concerning details of what had happened.

### A. Background Facts

Before allowing into evidence testimony regarding Petitioner's silence, the trial court heard arguments outside the presence of the jury as to its admissibility. (Lodged Doc. 7, 3 Rep.'s Tr. at 908-18.) The trial court concluded that it was admissible (id. at 913-15), and Officer Miranda then testified in front of the jury as follows:

> Q. Now, the Defendant admitted to you that he stabbed the — Mr. Escobar, the victim. And did he — and then he said that it was in self-defense; correct?
> A. Correct.
> Q. Did you ask him further details about the self-defense that he claimed?
> A. I attempted to ask him.
> Q. What happened?
> A. He just became uncooperative, and he said that's all he's gonna tell me.
> Q. So the Defendant didn't tell you any other information about how he defended himself?
> A. Correct.
> Q. At that time did you ask him any further questions?
> A. No.

| | |
|---|---|
| 1 | Q. Did the Defendant ever tell you anything about Mr. |
| 2 | Escobar — |
| 3 | [Defense Counsel]: Objection. Miranda. |
| 4 | Q. [Prosecutor]: — having a knife? |
| 5 | A. No. |
| 6 | THE COURT: I'm sorry? |
| 7 | [Defense Counsel]: Objection. Miranda. |
| 8 | THE COURT: You mean during this conversation, after the |
| 9 | Miranda rights; correct? |
| 10 | [Prosecution]: After the Miranda rights, correct. |
| 11 | THE COURT: Overruled. |
| 12 | THE WITNESS: No. |
| 13 | Q. [Prosecutor]: Did the Defendant ever tell you |
| 14 | anything about — |
| 15 | [Defense Counsel]: Objection. May we approach? |
| 16 | THE COURT: No. Denied. |
| 17 | Proceed. |
| 18 | . . . . |
| 19 | Q. Did the Defendant ever tell you anything about Mr. |
| 20 | Escobar striking him or using any force against |
| 21 | him? |
| 22 | A. No. |
| 23 | Q. When you were talking to the Defendant and |
| 24 | observing him in the car, did he ever complain of |
| 25 | any injuries to him, meaning the Defendant? |
| 26 | A. He did not. |
| 27 | (Id. at 965-66.) |
| 28 | The prosecutor also questioned Petitioner on cross- |

1   Q.  Did the Defendant ever tell you anything about Mr.
2       Escobar —
3   [Defense Counsel]: Objection.  Miranda.
4   Q.  [Prosecutor]: — having a knife?
5   A.  No.
6   THE COURT: I'm sorry?
7   [Defense Counsel]: Objection.  Miranda.
8   THE COURT: You mean during this conversation, after the
9        Miranda rights; correct?
10  [Prosecution]: After the Miranda rights, correct.
11  THE COURT: Overruled.
12  THE WITNESS: No.
13  Q.  [Prosecutor]: Did the Defendant ever tell you
14      anything about —
15  [Defense Counsel]: Objection.  May we approach?
16  THE COURT: No.  Denied.
17      Proceed.
18  . . . .
19  Q.  Did the Defendant ever tell you anything about Mr.
20      Escobar striking him or using any force against
21      him?
22  A.  No.
23  Q.  When you were talking to the Defendant and
24      observing him in the car, did he ever complain of
25      any injuries to him, meaning the Defendant?
26  A.  He did not.
27  (Id. at 965-66.)
28      The prosecutor also questioned Petitioner on cross-